**STATE of Delaware**

v.

**Kevin KRICK.**

**Crim. A. Nos. IN92–06–0272 thru 0274 and IN92–06–0108.**

Superior Court of Delaware, New Castle County.

Submitted: Oct. 19, 1993.
Decided: Dec. 16, 1993.

Timothy Barron, of Dept. of Justice, Wilmington, for plaintiff.

Eugene J. Maurer, Jr., Wilmington, for defendant.

## OPINION

ALFORD, Judge.

In this case of first impression in Delaware, Kevin Krick ("Defendant") filed a motion to have the Court declare 11 *Del.C.*

§ 3513(b)(2)a.8. unconstitutional. Defendant contends that the statute infringes upon his right to confront witnesses against him in violation of the United States Constitution and Article One, section 7 of the Delaware Constitution. For the reasons set forth below, Defendant's motion is denied.

### BACKGROUND

Defendant was charged with two counts of First Degree Unlawful Sexual Intercourse, 11 *Del.C.* § 775, and two counts of Second Degree Unlawful Sexual Penetration, 11 *Del.C.* § 771. The offenses are alleged to have occurred between November 1991 and April 1992. The alleged victim of the offenses is the Defendant's then three-year-old-daughter ("the Child"). Following the alleged offenses the child has received treatment at the Terry Children's Psychiatric Center ("Terry Center") located in New Castle, Delaware. As a result of statements received from the Child's treating team at the Terry Center, the State has informed Defendant of its intention to have certain of the Child's out-of-court statements introduced under 11 *Del.C.* § 3513(b)(2)a.8. *See infra* pp. 335–336.

A pre-trial hearing was conducted on July 13, 1993, and continued on August 16 and 17, 1993,[1] for the Court to determine whether the Child was "unavailable" within the meaning of the statute and to determine the admissibility of her out-of-court statements pursuant to 11 *Del.C.* § 3513. During the hearing, two members of the Child's treatment team at the Terry Center testified regarding her treatment and diagnosis. Ms. Inez Hanson ("Ms. Hanson"), the Child's therapist who has extensive experience in child abuse cases, testified that she first examined the Child in May 1992. The Child underwent speech, language, motor, psychological and psychiatric evaluations, as well as educational evaluations. (Hr'g. Tr1. at 24–25). Ms. Hanson testified that the Child had very low coping skills and was referred to the Terry Center because she was

exhibiting very extreme, severe symptoms that were beyond what we would normally expect a child her age to be having. She was—she had regressed a great deal to a much younger age. She had a lot of trouble with sleeping. She was aggressive. Her thought processes were very disorganized. There were times when she would even deny being herself. She would use another identity.

(Hr'g. Tr1. at 21). Upon Ms. Hanson's meeting the Child, she observed that the Child was

extremely shy, would not talk. She was— she had an atypical gait to her walk. She was extremely withdrawn. She would not separate physically—I mean she was just like curled up with her mother. When she did start to open up a little bit, there was a dramatic difference. She would be either very sophisticated for her age one minute, and then the next time be very childish, very babyish, so there was a great deal of extreme difference. Sometimes her thinking was very, very disorganized. She couldn't coherently tell you things a child of three should be able to do.

(Hr'g. Tr1. at 23). Ms. Hanson further stated that testifying in an open courtroom would be devastating for the Child. (Hr'g. Tr1. at 28–29). She testified that the Child currently suffers from "over-anxious disorder" and was at risk for developing post-traumatic disorder and multiple personalities disorder. She testified that the Child would suffer severe emotional trauma were she required to give a videotaped deposition at which the Defendant was present, were the Child required to testify by means of closed circuit television or were she required to give live testimony in an open courtroom. (Hr'g. Tr1. at 32). Ms. Hanson further testified that the Child had been prescribed Vistaril, a medication that improved her ability to cope.

Dr. Andrea Stern ("Dr. Stern"), a clinical psychologist, also testified at the preliminary hearing. Dr. Stern testified that she became associated with the Child in December 1992 and conducted a psychological evaluation.

---

**1.** Hr'g.Tr1., Hr'g.Tr.2. and Hr'g.Tr3. refer to the trial transcripts from July 13, 1993; August 16, 1993; and August 17, 1993, respectively.

She opined that a courtroom setting would be traumatic for the Child. (Hr'g. Tr1. at 45) She also testified that if required to discuss her abuse by closed circuit television, the Child would likely regress. (Hr'g. Tr1. at 47).

During the hearing, both Ms. Hanson and Dr. Stern testified that the Child would suffer extreme emotional harm, which would include a strong risk of emotional and physical regression, should she be required to testify. Despite undergoing vigorous cross-examination, both witnesses remained steadfast in their assertions that the Child would suffer extreme emotional harm should she be required to testify in court, by deposition or by close circuit television. (Hr'g. Tr2)

However, under cross-examination, it was brought out that the Child had not attended the Terry Center day program since June 14, 1993. Instead, on the advice of the treatment team, the Child had been placed in a day care program in order to be mainstreamed with other children. Thus, the Child had not been seen by any member of the Terry Center treatment team since that date. Ms. Hanson testified that there was an intention that the Child be seen by the treatment team during this period, but due to scheduling conflicts she was not. Treatment was expected to resume in the near future.

In view of the Child's apparent success attending a day care program from June 14, 1993, until approximately August 16, 1993, the Court found reason to believe that the Child's emotional condition might have changed since her original diagnosis. This Court therefore ordered that the Child be re-evaluated in order to determine whether there was any change in her ability to testify.

By letter to Deputy Attorney General Timothy Barron ("Mr. Barron") dated September 28, 1993, Dr. Stern and Ms. Hanson reported that they conducted an interview of the Child on September 9, 1993. Their report indicated that because the Child "appeared to have maintained many behavioral improvements (both by observation and by mother's report) it was decided to attempt some presumably stressful questioning in the safe environment of the therapy room." Ms. Hanson and Dr. Stern reported that they shared some "sensitive information" and with the structure of Ms. Hanson's arms around the Child, some of her physical manifestations of anxiety during the questioning were contained. The letter further stated that the Child's mother, Mrs. Kathleen Krick ("Mrs. Krick"), reported that the Child had not exhibited any regressive behavior as a result of this interview.

In view of Mrs. Krick's report, a second session was held where Mr. Barron asked the Child questions of a sensitive nature. Again, the Child was physically held by Ms. Hanson in order to limit the stress involved. Dr. Stern and Ms. Hanson reported that "[the Child] responded with more anxious symptoms including stiffening of her body, refusing to answer questions, and changing the subject." The day after this session, Mrs. Krick reported that the Child [acted out] more seriously at home than had been noted for some time. She was aggressive with her two-year-old sister, she wet the bed (for the first time in a year) and had sleep difficulties despite the use of medication at bedtime. As a result, Dr. Stern and Ms. Hanson reaffirmed that it was

> their continued opinion therefore, that while [the Child] seems to be functioning adequately when she is not required to discuss the alleged abuse, her behavior deteriorates quickly and severely when she is pressured to speak about those events. Since testimony either in person or by videotape or closed circuit television, would be infinitely more stressful than the circumstances of [Mr. Barron's] questioning [at Terry Center], we feel that there is substantial likelihood that the Child would experience severe emotional trauma if required to testify.

Defendant challenges 11 *Del.C.* § 3513 [2], the hearsay exception for child victim's out-of-court statement of abuse. The statute provides:

(a) An out-of-court statement made by a child under 11 years of age at the time of the proceeding concerning an act that is a

2. 11 *Del.C.* § 3513 was adopted on July 10, 1992.

material element of the offense relating to sexual abuse, or physical abuse as delineated in §§ 765, 766, 768, 769, 770, 771, 772, 773, 775, 783, 783A, 611, 612, 613, and 1108 of this title that is not otherwise admissible in evidence is admissible in any judicial proceeding if the requirements of subsections (b)–(f) of this section are met.

(b) An out-of-court statement may be admitted as provided in subsection (a) of this section if:

(1) The child is present and his or her testimony touches upon the event and is subject to cross-examination rendering such prior statement admissible under § 3507 of this title; or

(2)a. The child is found by the court to be unavailable to testify on any of these grounds:

 1. The child's death;

 2. The child's absence from the jurisdiction;

 3. The child's total failure of memory;

 4. The child's persistent refusal to testify despite judicial requests to do so;

 5. The child's physical or mental disability;

 6. The existence of a privilege involving the child;

 7. The child's incompetence, including the child's inability to communicate about the offense because of fear or a similar reason; or

 8. Substantial likelihood that the child would suffer severe emotional trauma from testifying at the proceeding or by means of a videotaped deposition or closed circuit television.

b. The child's out-of-court statement is shown to possess particularized guarantees of trustworthiness.

(c) A finding of unavailability under subsection (b)(2)a.8. of this section **must** be accompanied by expert testimony.

(d) The proponent of the statement must inform the adverse party of the proponent's intention to offer the statement and the content of the statement sufficiently in advance of the proceeding to provide the adverse party with a fair opportunity to prepare a response to the statement before the proceeding at which it is offered.

(e) In determining whether a statement possesses particularized guarantees of trustworthiness under subsection (b)(2) of this section, the court may consider, but is not limited to, the following factors:

(1) The child's personal knowledge of the event;

(2) The age and maturity of the child;

(3) Certainty that the statement was made, including the credibility of the person testifying about the statement;

(4) Any apparent motive the child may have to falsify or distort the event, including bias, corruption or coercion;

(5) The timing of the child's statement;

(6) Whether more than one person heard the statement;

(7) Whether the child was suffering pain or distress when making the statement;

(8) The nature and duration of any alleged abuse;

(9) Whether the child's young age makes it unlikely that the child fabricated a story that represents a graphic, detailed account beyond the child's knowledge and experience;

(10) Whether the statement has a "ring of veracity," has internal consistency or coherence and uses terminology appropriate to the child's age;

(11) Whether the statement is spontaneous or directly responsive to questions;

(12) Whether the statement is suggestive due to improperly leading questions;

(13) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement.

(f) The court shall support with findings of the record any rulings pertaining to the child's unavailability and the trustworthiness of the out-of-court statement.

11 *Del.C.* § 3513 (emphasis added).

## DISCUSSION

 Defendant argues that the statute must expressly require a separate hearing to

determine the unavailability of the Child in order for the statute to be constitutionally sound. The Court has held such a hearing and therefore Defendant's procedural due process challenge is moot. However, the Court notes that the statute requires the Court to make a finding of the Child's unavailability, which "must" be supported by expert testimony. 11 *Del.C.* § 3513(c). Implicit in this language is the requirement that the Court conduct a hearing on this issue. "Constitutionally requisite procedures for the administration of a statute may be implied in order to preserve its validity." 2A *Sutherland Stat. Const.* § 45.11 (5th Ed.). If a statute can reasonably be interpreted in one of several ways, the interpretation giving the statute constitutional effect must be used. *Id.* at 49.

Defendant further contends that the statute does not allow him to independently determine whether the Child will be able to testify in person or by alternate means. Defendant relies on *Miller v. State,* Ind.Supr., 531 N.E.2d 466 (1988), for the proposition that the out-of-court statements of a three-year-old child are not admissible when the defendant is not provided with an adequate opportunity to cross-examine the alleged child victim. *Miller,* however, involved a child hearsay exception statute that is markedly different from the Delaware statute in that "[t]he [Indiana] statute provides that a hearing, *attended by the child,* be held to determine whether the out-of-court statements contain sufficient indicia of reliability to warrant admissibility." *Miller,* 531 N.E.2d at 470 (emphasis added). The Delaware statute contains no such provision requiring the Child's presence at a hearing, and therefore *Miller* is distinguishable from the instant case.

Defendant moves this Court to declare 11 *Del.C.* § 3513 violative of his right to confront witnesses against him. Delaware courts have held that legislative enactments are presumptively constitutional. *Traylor v. State,* Del.Supr., 458 A.2d 1170 (1983). However, the United States Supreme Court has repeatedly declined to rule that every codified hearsay exception assumes constitutional stature. *Idaho v. Wright,* 497 U.S. 805, 110

S.Ct. 3139, 111 L.Ed.2d 638 (1990). The State, in response to Defendant's motion, points out that at least 31 states have adopted rules allowing for the use of out-of-court statements by child sexual abuse victims where the trial judge, after a hearing, determines that the statements are trustworthy or reliable. The State argues that to abrogate these rules or to make them so restrictive as to render them useless would defeat the State's strong interests in protecting child victims of sexual and physical abuse as well as the State's interest in prosecuting the abusers. The State argues that hearsay statements of child sexual abuse victims are necessary to the prosecution of child abusers and that the admission of these statements violates neither the federal and state constitutions in general, nor the Defendant's right of confrontation in particular, as long as these out-of-court statements possess "particularized guarantees of trustworthiness" as required by the Sixth Amendment of the United States and 11 *Del.C.* § 3513(c).

Defendant asserts that § 3513 is unnecessary because the provisions for testimony procured through closed circuit television provided in 11 *Del.C.* § 3514 are available to protect the child victim.

Eleven *Del.C.* § 3514 provides:

(a)(1) In cases of crimes involving sexual or physical abuse as defined in §§ 763–775, 611–613 and 1108 of this title, a court may order that the testimony of a child victim less than 11 years of age be taken outside the courtroom and shown in the courtroom by means of closed circuit television if:

a. The testimony is taken during the proceeding; and

b. The judge determines that testimony by the child victim in the courtroom will result in the child suffering serious emotional distress such that the child cannot reasonably communicate.

(2) Only the prosecuting attorney, the attorney for the defendant, and the judge may question the child.

(3) The operators of the closed circuit television shall make every effort to be unobtrusive.

(b)(1) Only the following persons may be in the room with the child when the child testifies by closed circuit television:

 a. The prosecuting attorney;

 b. The attorney for the defendant;

 c. The operators of the closed circuit television equipment; and

 d. Any person whose presence, in the opinion of the court, contributes to the well-being of the child, including a person who has dealt with the child in a therapeutic setting concerning the abuse.

(2) During the child's testimony by closed circuit television, the judge and the defendant shall be in the courtroom.

(3) The judge and the defendant shall be allowed to communicate with the persons in the room where the child is testifying by any appropriate electronic method.

(c) The provisions of this section do not apply if the defendant is an attorney pro se.

(d) This section may not be interpreted to preclude, for purposes of identification of a defendant, the presence of both the victim and the defendant in the courtroom at the same time.

11 *Del.C.* § 3514. Defendant argues that, at a minimum, the Court should require the Child to testify in person by way of closed circuit television or any "appropriate electronic method" as permitted by § 3514. Defendant contends that this procedure has been sanctioned by the United States Supreme Court. *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Defendant further asserts that the alternative methods provided by § 3514 not only protect the Child, but ensure the reliability of the Child's testimony by requiring the Child to submit to cross-examination while the jury and the accused observe the demeanor of the witness in response to questions. Defendant asserts that even where there is a determination by the Court that a child victim will suffer "serious emotional distress" or "severe emotional trauma," the Child should be made to testify pursuant to 11 *Del.C.* § 3514.

Defendant's assertions fail because while §§ 3513 and 3514 both seek to protect child victims in similar circumstances, they are not equal in the protections they afford the child victim. In fact, § 3514 is applicable only when a child is available to testify. This Court is satisfied that based upon the expert testimony of Dr. Stern and Ms. Hanson, along with their supplemental report of September 28, 1993, that the alleged victim, now four years old, cannot be made to testify either in person, by closed circuit television or any other electronic method without a substantial risk that the Child would suffer severe emotional trauma.

The Defendant's position is that should the Court make a ruling allowing the admission into evidence of the Child's out-of-court statements through third party testimony under 11 *Del.C.* 3513(b)(2)a.8., the admission would impermissibly deny his fundamental right to confront his accuser, thus preventing defense counsel from conducting an effective cross-examination. Defendant relies upon *U.S. v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), and argues that he must be given "the opportunity for a full and fair opportunity to probe and expose [any] infirmities of the witness' testimony through cross-examination." Citing *Wright*, 497 U.S. at 817, 110 S.Ct. at 3147–48, the State contends that the Defendant's confrontation rights are not violated because the Child's out-of-court statements contain particularized guarantees of reliability.

The Court agrees with the State's contention that *Wright* is controlling in the instant case. In *Wright*, the United States Supreme Court considered whether the admission into evidence of certain hearsay statements, by a two-and-a-half-year-old declarant, made to an examining pediatrician violated the defendant's confrontation rights. The alleged victim had been found "not capable of communicating to the jury." *Id.* at 809, 110 S.Ct. at 3143. The Court found that the "particularized guarantees of trustworthiness" required for admission under the Confrontation Clause must be "drawn from the totality of circumstances that surround the making of the statement and that renders the declarant worthy of belief." *Id.* at 820, 110 S.Ct. at 3149. The State concedes that 11 *Del.C.* § 3513 is not a firmly rooted hearsay exception, and therefore this Court is required to determine whether the Child's out-of-court

statements possess the particularized guarantees of trustworthiness needed to satisfy the Confrontation Clause of the United States and Delaware Constitutions.

■ The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... **to be confronted with the witnesses against him** ... U.S. Const. Amend. VI (emphasis added). Similarly, the Delaware Constitution provides that

> In all criminal prosecutions, the accused hath a right to be heard by himself and his counsel, to be plainly and fully informed of the nature and cause of the accusation against him, **to meet the witnesses in their examination face to face,** to have compulsory process in due time, on application by himself, his friends or counsel, for obtaining witnesses in his favor, and a speedy and public trial by an impartial jury; he shall not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgement of his peers or by the law of the land.

Del. Const. Art. 1, § 7 (emphasis added).[3] Under the Confrontation Clauses of the United States and Delaware Constitutions, the accused in a criminal proceeding is guaranteed the right to be confronted with witnesses against him. *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). However, the right to cross examine is not absolute but is subject to reasonable limits where it conflicts with other trial considerations. *Id.* The Supreme Court has also held that the Confrontation Clause reaches no further than to require the prosecution to produce any available witness whose declarations it seeks to use in a criminal trial. *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). In this Court's view, 11 *Del.C.* § 3513 includes sufficient safeguards to protect Defendant's sixth amendment confrontation rights.

■ In order to determine whether Defendant's sixth amendment rights are protected, the Court must be assured that pursuant to § 3513(b)(2)b, the Child's out-of-court statements are shown to possess particularized guarantees of trustworthiness. In making this determination, the Court employs a totality of circumstances approach used by the United States Supreme Court in *Wright,* 497 U.S. at 820, 110 S.Ct. at 3149. The Court, however, limits its examination to the circumstances surrounding the making of the statements that cause the Child's statements to be worthy of belief. *Id.* at 819, 110 S.Ct. at 3148–49.

At the August 16 and 17, 1993, hearings, the Child's mother, Mrs. Krick and the Child's adult cousin, Sharon Walsh Mitchell ("Mrs. Mitchell") testified regarding the Child's out-of-court statements. In light of 11 *Del.C.* § 3513(f) which requires the Court to support its rulings with findings of the record, relevant portions of the pre-trial hearing are included. Mrs. Mitchell testified, in part, as follows:

Q. And tell the Court, tell Judge Alford what if anything the Child said when she saw the hole in your pants?

A. She had stuck her finger in it, and she said "I'm going to stick my fingers in the hole." And I said "No, don't do that." And she said "Well, I'm going to touch your hickey." And I told her, I said "No. Nice people, we don't touch other people's hickeys," and she said "Yes, we do. I'm going to stick it in there and touch your hickey." And I said "No." And she said "Well, my daddy puts his fingers on my hickey. He touches my hickey." I said "... nice people don't do that. We don't touch each other's hickeys." And that was about it.

Q. How old was the Child when she said that?

A. I guess she was about three, about three.

(Hr'g. Tr2. at 6). Mrs. Mitchell was asked did she know what the child meant by the term "hickey." She replied "Yeah. In our family, my grandmother uses that terminology for our private parts." (Hr'g. Tr2. at 7).

---

3. The Delaware Constitution requires a "face to face" meeting between an accused and his accuser. However, this language has not been interpreted literally by the Delaware Supreme Court or the United States Supreme Court.

On cross examination by defense counsel, Eugene Maurer, Jr. ("Mr. Maurer"), Mrs. Mitchell testified in part as follows:

Q. Had you, yourself, referred to the penis of a man's body as a hickey in front of the child previously?

A. Not that I can recall.

Q. Had you ever heard her refer to that portion of a male's body as a hickey?

A. Yes. We all used them. I can't specifically say that I heard the Child call a man's penis a hickey, but that's just— Any time you would speak of your private parts, you called it a hickey, male or female.

Q. All right. Now, the hole that you had in your sweatpants was in which portion? Was it right in your crotch area or was it on your thigh?

A. No, it was on my left thigh, upper left thigh.

Q. And in terms of being how far down from your waist, how far would you say that is?

A. It was probably maybe fingertip length.

Q. I can't see that. Do you mind standing up?

A. It was probably about here.

Q. The witness is point mid—

A. Upper thigh.

Q.—in the middle of the thigh?

A. Mm-hmm.

Q. And you say that the Child put her finger in that area at that point in time?

A. Yes, she did.

Q. All right. And you told her that she shouldn't do that?

A. Right. Just because I didn't want her to make the hole bigger, at first. I just didn't want her tearing it, making it bigger.

Q. And the word "hickey" was first uttered by you or by her at that point?

A. By her.

Q. What you're telling us today, do you have a specific recollection of what she said, or are you sort of summarizing?

A. No. I can. I can remember her saying—She said it like almost threatening, like "I'm going to put my finger in your hickey," or "in your hole." And I said "No, . . .," just because I didn't want her to tear it. I can remember her looking at me and saying "I'm going to put my finger in your hole." And I said "No."

Q. All right. Now, what you just said—And you said two things. If I hear you correctly, you said that she said "I'm going to put my finger in your hickey," but you also said that she said "I'm going to put my finger in your hole."

A. At first she said "I'm going to put my finger in your hole," and she had her finger near the hole.

Q. Near the hole of the sweatpants?

A. Of the sweatpants. And I said "No," because I didn't want her to tear it and make it bigger. And then she said, you know, "I'm going to"—

Q. And what were her next words?

A. "I'm going to touch your hickey." And I said "No. Nice people don't do that."

Q. Let me stop you for a minute. I want to go through this, one-by-one. The next words you recall her saying were "I'm going to touch your hickey?"

A. "I'm going to touch your hickey."

Q. Is that a verbatim quote?

A. I can't honestly say that was verbatim, but that was what she was saying to me; and I said "No."

Q. Slow down. I can't write as fast as you're talking.

Okay. You recall, although you're not sure it's verbatim, that the next thing she said was "I'm going to touch your hickey?"

A. I can't honestly say that was verbatim, but I know that was the next thing that she said to me. And I said "No. Nice people don't do that."

Q. Okay. And her response to that was?

A. She just looked at me, and she continued.

Q. Continued doing what?

A. She said "I'm going to touch your hickey." And I said "No. We don't do that." And she said, "But Daddy touches my hickey with his fingers." And I said "No."

Q. So she then said, again, that "I'm going to touch your hickey." Right?

A. Mm-hmm.

Q. And again, you said "No." And then she said that "Daddy touches my hickey with his fingers?"

A. Yes. And—

Q. Hmm?

A. Yes. She said "Daddy does."

Q. Anything else said at that time?

A. She just said—And she said "I'm going to put my fingers in your hickey." I can't remember if it was all together, but she said both. She said—At first, she said "I'm going to put my fingers in your hickey." She kept at me. She kept trying to get me to let her do it, and I wouldn't let her. I kept saying "No."

Q. Did she continue to talk about her daddy, or did she just say that the first time? In other words, I'm trying to get the sequence down here.

A. Did she continue to talk about her daddy?

Q. What you said so far, if you'll listen to me, please, is that she said to you "I'm going to put my fingers on your hickey." Okay? And then you said "No. Nice people don't do that." And she said "Daddy touches my hickey with his fingers." Right?

A. "Daddy touches my hickey," mm-hmm.

Q. "With his fingers?"

A. Right.

Q. And then your response to that was?

A. "Nice people don't do that."

Q. "Nice people don't do that." And you say that at some point thereafter, she said that she was going to put her finger—

A. Right. She kept continuing. She kept at you. She kept wanting to do it, and she kept playing with the hole, and she kept wanting to do it. And I kept telling

her "No," and she kept continuing, "Daddy puts his fingers in my hickey." It was this whole thing. She wouldn't stop. She wouldn't let up. She just kept at you. It was like a game. She was joking.

Q. You said it was like she was joking?

A. It was like some kind of game to her, like she kept doing it, and she was so persistent. And she kept doing it, and I kept telling her "No."

(Hr'g. Tr2. at 14–19).

Mrs. Krick testified in part as follows:

Q. Shortly after visitation started, did the Child tell you about any of the games that she and her father would play?

A. Just the lions and bears.

Q. What did she say that was all about?

A. She said that Daddy's hickey was the lion, and—or her hickey was the cave, and Daddy's hickey was the bear. And she just went through this whole long story about how when she touched Daddy's hickey, it grew, and stuff like that....

Q. Did the Child just describe the object of the game of bears and caves or whatever?

A. I don't understand what you mean, like.

Q. What was the bear supposed to do with the cave?

A. Oh. When she was saying that, first, she said that the bear grew, and then it would have to go into the cave, and the cave was her hickey....

Q. Do you recall a visitation in April of 1992 when the Child acted really strange upon her return from that visitation?

A. Mm-hmm.

Q. Could you tell Judge Alford about that?

A. Well, when the Child came home, she was acting like she was mad at me. She was distant, and she was very, like, kind of frustrated and upset. And she went through the day like that.

And that was the night, when I gave her her bath, and I put her in the water, and I went to wash her, like I always do, and she yelled, screamed, like let out with one of

those real awful screams. And she said "Don't touch my hickey. My hickey hurts."

And you know, I must have looked funny at her because she was still crying, and I couldn't calm her down. And she said "Daddy popped my hickey, and it was bleeding. Don't touch my hickey." And she kept, like, crying and saying it over and over again.

And when she calmed down a little, she said, you know, "My magic made the bleeding stop when Daddy popped my hickey." And, you know that—that was the same day....

Q. Did she tell you that some part of Daddy's anatomy grows?

A. Oh, when she touches it? Yeah. That was—she just said that when she had—well, we were sitting around, and she said that she had—She said "I have magic hands." I said "You do?" And she said "Yeah. I have magic hands. When I touch Daddy's hickey, it grows."

And you know, that's when she kept saying, and she said that a lot after that, "Daddy says I have magic hands, and when I touch his hickey, it makes his hickey grow." ...

Q. Well, there was a weekend—Let me withdraw that. What was the incident which led you to call Child Protective [Services]; and as best as you can recall, when did that particular incident occur?

A. I would think it was—I know I called Child Protective; [sic] [Services] on May 5, and it was right then when she had told me that I had asked her where the underwear were. And she said "My underwear." And when she doesn't want to talk to you, she kind of repeats what you say and kind of looks around.

And I said "... your underwear, do you have any idea where they are?" And I was looking through the bag. And she said "Well, Daddy threw them out." And I said "Well, why did he throw your underwear out?" She said "Well, when he popped my hickey, I got blood all over them, and he threw them out." And then she said "He wouldn't let me keep them and take them home."

... And she talked a lot over the next—even the hours after she said this, she talked a lot about "I have a magic hickey." She would say that over and over again....

And I finally think I just had had enough. It came down to where I had to believe her and do something, or listen to Kevin. And I kind of knew at that point, no matter how much I cared about him or us or anything, it wasn't, you know, wasn't worth the child going through all that. So I called.

Q. The next day, after you reported on the 5th of May, on the 6th of May, do you remember having had the telephone conversation with your mom?

A. Mm-hmm.

Q. And where was that? Where were you?

A. In the kitchen.

Q. Where was the Child?

A. She was sitting right next to me. I had the high chair, without the tray, next to me, kind of like she was leaning on my shoulder.

Q. And were you just simply engaged in a conversation with your mother?

A. Yes.

Q. And did the Child say anything or blurt out anything at that time?

A. Yeah. She sat on the high chair, and she, like, made a funny face, and she said, you know, "Mommy." I said "What, Honey?" She said "My hickey doesn't hurt as bad now as when Daddy popped my hickey." And I said "It doesn't?" And she said "No, it doesn't, because my magic made it stop." And my mom kind of like got really upset ...

(Hr'g. Tr2. at 29–37).

The United States Supreme Court has declined to establish a rigid or mechanical test for determining "particularized guarantees of trustworthiness" under the Confrontation Clause. *Id.* at 822, 110 S.Ct. at 3150. The Supreme Court did, however, reiterate several factors which have been found by both state and federal courts to bear upon whether hearsay statements by child abuse victims

are reliable. *Id.* at 821, 110 S.Ct. at 3149–50. These non-exclusive factors include spontaneity, consistent repetition, the mental state of the declarant, the use of terminology unexpected of a child and the lack of motive to fabricate. *Id.* (citations omitted).

11 *Del.C.* § 3513(e)(1)–(13) likewise provides for a determination that an out-of-court statement possess "particularized guarantees of trustworthiness." The statute lists factors which the Court may consider in determining whether a statement possesses trustworthiness. The factors noted by the Supreme Court are present in the Delaware statute.

This Court is of the opinion that Defendant has interpreted his confrontation rights too broadly. Defendant's right to confrontation is necessarily limited by a witness' availability. *Tucker v. State,* Del.Supr., 564 A.2d 1110 (1989). In the instant case, the Child is

4. Defendant argues that he should be allowed to have the Child examined by his own expert and has motioned the Court to this effect. It should be noted, however, that the State did not hire an independent psychologist but rather has relied on the opinions of the Child's counselor and her psychologist who were and continue to be part of the Child's treatment team.

5. See, e.g. 42 Pa. Cons.Stat.Ann. Sec. 5985.1 (1990 Pa.Legis.Serv.Act 100 (Purdon)); and *Coy v. Iowa,* 487 U.S. 1012, 1025, 108 S.Ct. 2798, 2805, 101 L.Ed.2d 857 (1988) (O'Connor, J. concurring) ("if a court makes a specific finding of necessity, as is required by a number of state statutes ... our cases suggest that the strictures of the Confrontation Clause may give way to compelling State interest in protecting child witnesses.").

An indicia of reliability may be presumed from firmly rooted exceptions to the hearsay statute. However, here the parties and this Court agree that the hearsay exception for child victims of sexual abuse is not a firmly rooted exception.

6. (1) *See,* for example, the following state statutes providing for child sexual abuse exceptions to the hearsay rule: Alabama, Ala.Code Sec. 15–25–31 to 15–25–37 (1989); Alaska, Alaska Stat. Sec. 12.40.110 (1985) (grand jury only); California, Cal.Evid.Code Sec. 1228 (1985); Colorado, Colo. Rev.Stat. Sec. 13–25–129 (1987), Sec. 18–3–411(3) (1985); Florida, Fla.Stat.Ann. Sec. 90.-803(23) (1985); Georgia, Ga.Code Ann. Sec. 24–3–16 (1986); Idaho, Idaho Code Sec. 19–3024 (1986); Illinois, Ill.Ann.Stat. Ch. 38, Sec. 115–10 (1987); Indiana, Ind.Code Ann. Sec. 35–37–4–6 (1990); Kansas, Kan.Stat.Ann. Sec. 60–460(dd) (1983); Maine, Me.Rev.Stat.Ann. tit. 15, Sec. 1205 (1989); Massachusetts, Mass.Stat. ch. 233,

unavailable for cross-examination. In addition, the Child's statements, which the State seeks to admit under 11 *Del.C.* § 3513, contain particularized guarantees of trustworthiness. Defendant concedes that in the prosecution of sex offender cases where the alleged victim is a child, there is a compelling State interest in protecting the child victim from suffering any emotional harm as a result of the proceedings.[4]

In its response to Defendant's motion, the State correctly points out that in addition to a finding of unavailability a finding that the statements have an "indicia of reliability" is also required. *Wright,* 497 U.S. at 815, 110 S.Ct. at 3146–47.[5] The State goes on to point out that such exceptions to the hearsay rules have been promulgated by (1) legislation, (2) evidentiary rules and by (3) case law.[6]

Sec. 81 (1990); Minnesota, Minn.Stat.Ann. Sec. 595.02(3) (1986); Missouri, Mo.Rev.Stat. Sec. 491.075 (1985); Nevada, Nev.Rev.Stat. Sec. 51.-385 (1985); New Jersey, N.J.R.Evid. Sec. 63(33) (1989); Oklahoma, Okla.Stat.Ann. tit. 12, Sec. 2803.1 (1990); Oregon, Or.Rev.Stat.Sec. 40.460, Rule 803 (1989); Pennsylvania, PA.Stat. tit. 42, Sec. 5985.1 (1989); South Dakota, S.D.Codified Laws Ann. Sec. 19–16–38 (1987); Texas, Tex. Code Crim.Proc.Ann. art. 38.072 (1985); Utah, Utah Code Ann. Sec. 76–5–411 (1988); Vermont, Vt.R.Evid. Sec. 804a (1986); Washington, Wash. Rev.Code Ann. Sec. 9A.44.120 (1985).

(2) Ark.R.Evid. 803(25)(A); Cal.Evid.Code S. 1228 (West 1985); 67 Mich.Bar J. 68 (July 1988) (proposed); Miss.R. 803(25) (proposed); N.J.Evid.R. 63(33); N.D.R. 803(24) (eff. 3/1/90); Vt.R.E. 804(9) (Supp.1988).

(3) Courts have allowed out-of-court declarations of child victims under firmly rooted exceptions to the hearsay rule. The Supreme Court of Idaho recognized the admissibility of such declarations when they are "excited utterances" or part of the *res gestae. See State v. Wright,* 116 Idaho 382, 775 P.2d 1224, 1230–1231 (1989) *cert. granted sub nom. Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Courts have also admitted such statements when made for the purposes of medical diagnosis or treatment under state rules similar to Fed. R.Evid. 803(4). *See, e.g., State v. Robinson,* 153 Ariz. 191, 735 P.2d 801 (1987); *People v. Galloway,* 726 P.2d 249 (Colo.App.1986); *Drumm v. Commonwealth,* 783 S.W.2d 380 (1990); *State v. Olesen,* 443 N.W.2d 8 (S.D.1989); *State v. Nelson,* 138 Wis.2d 418, 406 N.W.2d 385 (1987); *Goldade v. State,* 674 P.2d 721 (Wyo.1983), *cert. denied, sub. nom. Goldade v. Wyoming,* 467 U.S. 1253, 104 S.Ct. 3539, 82 L.Ed.2d 844 (1984).

The Court is required to interpret the statute so as to carry out the legislative intent of the act. *Richardson v. Wile,* Del. Supr., 535 A.2d 1346, 1348 (1988). The synopsis of the statute which originated as Senate Bill 360 [7] provides that

In child physical and sexual abuse prosecutions it is often times impossible to proceed when a child victim-witness "freezes" on the witness stand or cannot testify without the risk of suffering severe emotional trauma. Prior statements of such child-witness given to parents, teachers, counselors or the police are inadmissible under 11 *Del.C.* § 3507 because our Supreme Court has held that in order to satisfy the sixth amendment's confrontation clause, the testimony of such a witness must, at least, "touch upon the event." *Ray v. State,* Del.Supr., 587 A.2d 439 (1991).

*Ray* typified the common law prior to the enactment of 11 *Del.C.* § 3513. In *Ray,* the defendant was charged with Unlawful Sexual Penetration Second Degree and the alleged victim of the offense was a five-year-old child. At the defendant's trial, the victim refused to testify regarding what the defendant had done to her, but did testify regarding informing her aunt and a detective about what had been done to her. *Id.* at 443. The Delaware Supreme Court ruled that it was reversible error to admit the child's out-of-court statements on the basis of such limited foundation. *Id.* at 444.

The General Assembly attempted to remedy this type of situation by enacting 11 *Del.C.* § 3513.[8] By enacting this statute, the legislature has provided a procedure whereby out-of-court statements of child victims of sexual and physical abuse may be found to be admissible.

The legal community has recognized that there are sound reasons for allowing the admission of hearsay evidence as long as the reliability of hearsay statements can be assured. "[R]eliability of certain hearsay statements can be assured even without cross-examination of the original declarant. Trustworthiness can be inferred from the fact that the statement was made under or subjected to certain conditions that insure a degree of reliability comparable to that found *in a cross examined statement.*"[9] Most scholars agree that out-of-court statements should be admissible only if the requisite need and reliability can be shown to exist. The child's hearsay statement in a sexual abuse case is often the only proof of the crime. Therefore, child sexual abuse cases are unique to the extent that the use of children's statements is necessary in order to prosecute the abusers, yet the statements are not afforded the inherent reliability of firmly rooted hearsay exceptions. However, it has been argued that "even though out-of-court declarations by the victim may not be inherently reliable, they are, at the very least, as reliable as his or her in-court statements...." *Id.* at 1749. Thus, there arises an "unusually compelling need" for the admission of such evidence. *Id.* at 1750–51.

Furthermore, it has been pointed out that a child's memory fades quickly and as a result, the account of the alleged abuse given closer in time to the actual incident is the account that is more likely to be accurate. A child's inability to recollect details is especially significant in light of the lapse of time between the commission of the crime and the trial. *Id.*

Thus, "... in child sex abuse cases, the victim's out-of-court statements may, in fact be more trustworthy than his or her in-court testimony. *Id.* This occurrence is particularly relevant in the instant case where the alleged victim was three years old at the time of the alleged offense, is now four years old

*White v. Illinois,* 502 U.S. ——, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).

7. As amended by Senate Amendment No. 2.

8. The legislature further noted in its synopsis of Senate Bill 360 that it sought to include the procedural safeguard lacking in the Idaho statute (which was reviewed by the Supreme Court in *Idaho v. Wright*) and fashioned the Delaware statute after the model of the National Legal Resource Center for Child Advocacy and Protection of the American Bar Association.

9. Judy Yun, A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases, 83 Colum.L.Rev. 1745, 1747 (1983). (citing 4 J. Weinstein and M. Berger, Weinstein's Evidence, § 800[01], at 800–11 (1981 and Cum.Supp. 1982)).

and the Defendant has not yet been tried for the alleged abuses.

### *FINDINGS OF FACT*

Based upon the foregoing reasons the Court finds the out-of-court statements made by the Child (1) to have been made spontaneously without prompting or leading by third persons, (2) to have been repeated with sufficient consistency, (3) to include descriptions of activities not normally discussed by a three-year-old child, and (4) to be graphic and to contain detailed accounts of the events which are consistent with a child her age. Further, the Court finds no motive for fabrication either on the part of the child, Mrs. Krick or Mrs. Mitchell. In fact, it appears that Mrs. Krick chose to ignore the Child's statements and actions in order to preserve her relationship with Defendant. (Hr'g. Tr2. at 26, 30–31). Consequently, the Court upon considering the totality of circumstances surrounding the making of the Child's statements, finds that the statements contain a sufficient indicia of reliability.

### *CONCLUSION*

In light of the substantial risk of severe emotional trauma to the Child if she is required to relate the alleged abuse, it is hereby ordered that pursuant to 11 *Del.C.* § 3513:

(1) The Child is determined to be unavailable to testify at trial; and

(2) The State shall be permitted to introduce the Child's out-of-court statements to the extent they are based on the issues resolved by this Opinion.

Defendant's motion to declare 11 *Del.C.* § 3513(b)(2)a.8. unconstitutional is **DENIED**.

**IT IS SO ORDERED.**